# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE G.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 C 4210 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| ANDREW SAUL, Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§416(I), 423, a little over four years ago. (Administrative Record (R.) 255-56). She claimed that she has been disabled since November 14, 2016, due to multiple sclerosis, migraines, optic neuritis and right eye dysfunction, lesions on the brain and spine, depression, anxiety, asthma, cubital tunnel syndrome, pancreatitis, and gastritis. (R. 255-56, 275-76). Over the next three years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on April 10, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on August 25, 2020. [Dkt. #5]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

# I.

## A.

Plaintiff was born on March 28, 1991, making her just 25 years old when she alleges she became unable to work. (R. 255). In her young, working life, from 2012 through 2017, she's had a number of jobs, ranging from cashier to marketing to administrative assistant. (R. 292). Most recently, in the summer of 2018, she worked as a dietary aid in an assisted living facility. (R. 35). But, due to her MS, all of her jobs were part-time. (R. 52). And finding jobs she could do was further hampered by driving distance as her motor skills deteriorated (R. 41). She had to quit her last job because of needing so much time off for illness and treatments. (R. 41-42). The infusions were similar to chemotherapy, and they wore her down. (R. 53).

Plaintiff thought she could walk a mile depending on the weather, which affects her MS, if she takes it very slow. (R. 43). She had three good days a month. (R. 46). A good day was one when she did not need a cane to walk. (R. 46). Other times, she used a wheelchair. (R. 48). She could no longer drive due to her symptoms; at times she could not feel the brake pedal, for example. (R. 49). She relied on her fiancé for transportation and help getting around (R. 50) and getting dressed. (R. 83). Her condition made it too difficult to button clothing. (R. 83). "Other than that", the ALJ remarked, referring to her MS symptoms – "I guess you were capable of doing [office] work." (R. 45).

Plaintiff said she was attending classes at community college, hoping to become a part-time therapist. (R. 44). She was given accommodations in terms of attendance and using notes for tests. (R. 62). The ALJ remarked that scholastic competition used to be brutal, and there were no accommodations regardless of what problems one might have had. (R. 62-63).

2

5'3" 214 (R. 275).

This is a difficult record to review, and was for the ALJ as well. As is usually the case, it is massive; the medical record covers almost 1900 pages. (R. 350-2207). As is also usually the case, much of it is irrelevant and it has been thrown together in no discernible order. The plaintiff has taken the trouble to direct the court to what we must presume is the evidence that best supports her claim. But, even then, the task is difficult. On the one hand, those records show that plaintiff has been admitted to the hospital a few times, either for MS flare ups or depression or both. From time to time she uses a cane or even, to a lesser extent, a wheelchair. Obviously, she is unable to work on those occasions. On the other hand, medical records also tend to show normal or near normal examination results. Slight decreases in strength and reflexes for example, and normal gait; or, in terms of psychological evaluations, intact memory, concentration, and attention span. There's nothing in those records to suggest she is disabled. There is certainly objective evidence of multiple sclerosis and hospital treatment, so it would seem that something had to have been going on. The doctors just don't seem to have shared with us exactly what it was, at least not according to their exam notes.

From August 12, 2016 through August 14, 2016, Plaintiff was hospitalized for right upper and lower extremity weakness. (R. 630-46). Musculoskeletal exam was typical of what was just mentioned above: normal aside from 4/5 strength in right arm and leg. (R. 634). She received steroid treatment and responded well. (R. 630). MRI's of the brain and spine showed increases in demyelinating lesions compared to scans from the prior year. (R. 630-31, 638).

On November 16, 2016, plaintiff had an initial behavioral health evaluation with Dr. Attienza. (R. 1612-1615). Plaintiff related a history of depression with anhedonia, fatigue, sleep and

3

appetite disturbance, feelings of hopelessness, and suicidal ideation. (R. 1612). Upon examination, memory was intact, and attention span and concentration were normal. Mood was depressed and affect was restricted. Thought process and content were normal. (R. 1614). Judgment and insight were intact. (R. 1614). Again, this is the type of examination that was referenced above. There were more to come.

In December 2016, plaintiff was admitted to a hospital psychiatric day program, but she had to discontinue it temporarily due to illness. (R. 1609). On January 30, 2017, she was assessed with a moderate episode of major depressive disorder and an anxiety disorder. (R. 1609-1610). Exam at the time was normal in terms of memory, attention, concentration, mood, thought process and judgment. (R. 1610).

From March 25-28, 2017, plaintiff was hospitalized for an MS flare up and an apparent suicide attempt. (R. 709-10). Her boyfriend said he had found her with a knife pointed toward her wrist and called an ambulance. (R. 710). Her right extremity strength was 4+/5 and reflexes were normal throughout. (R. 705). She was only able to ambulate with a cane, and it was recommended that she have 24-hour assistance upon discharge. (R. 701).

Just a week later, on March 31, 2017, plaintiff went to the emergency room with altered mental status. (R. 952, 991-992). It was noted that she had recently been hospitalized for an MS flare, and her neurologist and psychiatrist referred her for evaluation of aggressive cognitive impairment. Exam revealed normal strength and range of motion throughout. There was some numbness of lower extremities, but no acute motor or sensory deficits. But, she had difficulty finding words to answer questions and was poorly kempt. (R. 993). Psychological assessment revealed euthymic, "alright mood"; logical thought process; fair insight and judgment; intact memory

4

and concentration. (R. 867, 877). Examining physicians noted that it was unclear whether plaintiff's altered mental status was more related to her MS or to her psychiatric condition. (R. 998). She was hospitalized for 5 days, through April 4, 2017. (R. 869). She continued to have word-finding difficulty, and reported throat and ear pain, which made it impossible to speak. (R. 869). She had difficulty processing thoughts and following conversations, and she was feeling overwhelmed. (R. 869). She required a readmission the day after her discharge for a history of depression and suicide attempts. (R. 881).

From April 22 to May 2, 2017, plaintiff was hospitalized with another MS flare and major depressive disorder. (R. 710-721). Mental exams throughout the stay were unremarkable: mood was good, thought process logical and goal-directed, insight and judgment fair, concentration fair, memory intact. (R. 712, 715, 718, 720). At a neurological assessment dated May 10, 2017, plaintiff scored 30/30 on a cognition tested, indicating no impairment in the areas of memory, attention, or other cognitive skills. (R. 1569). Range of motion was normal, but strength was reduced in the right should (3+/5), right elbow (4/5), forearm (4/5), and wrist (4-/5). (R. 1569). Grip strength was below normal. (R. 1570). Sensation was normal. (R. 1570).

From May 26-28, 2017, plaintiff was hospitalized for generalized fatigue and muscle weakness, cognitive problems, and memory loss. (R. 1541). She was diagnosed with relapsing remitting MS, depression with history of suicide attempts, worsening neurocognitive and affective symptoms, and memory impairment, likely related to MS and depression. (R. 1541). MRI was negative for new lesions. (R. 1541, 1542). She ambulated with a cane on discharge. (R. 1541). Exam reveal power normal on the left, but 4+/5 on the right with pronator drift and slowed finger taps. Coordination was intact. There was some numbness in right arm, leg and right side of face.

5

Plaintiff ambulated with a cane and some circumduction of the right leg. (R. 1545).

Plaintiff began psychological therapy with Chloe Brodner in May 2017. At the initial session, she reported she was in an abusive relationship and subject to sexual assault. (R. 1956). At the same time, she reported no current victimization. (R. 1972). She used marijuana socially. (R. 1962). She was working part-time from home doing data entry. (R. 1964). Mood was depressed and anxious. (R. 1974). Affect was appropriate. (R. 1974). Thought process, thought content, and perception were all normal. (R. 1974). Memory was intact. (R. 1974). Attention was appropriate and sustained. (R. 1973). There was no evidence of suicidal ideation. (R. 1974). Throughout several months of bi-weekly and weekly therapy, Ms. Brodner reported that these findings never changed, while response to treatment ranged between fair and good. Plaintiff's compliance with treatment, however, was rated as low to partial. (R. 1985-2041).

On October 17, 2017, neurology notes indicate that plaintiff's primary complaint was fatigue. (R. 2051-2052). She sometimes walked with a cane. (R. 2051). Her mood was stable. (R. 2051). Plaintiff reported a good relationship with her boyfriend, was working three day a week from home, and had begun classes at a community college. (R. 2051). Mental status exam was normal. (R. 2051). Motor strength was normal throughout with the exception of 5-/5 in the right foot. (R. 2052). Sensation was normal but reflexes were reduced in the left extremities. (R. 2052). Gait was narrow-based and stable. (R. 2052). She was assessed with depression, recurrent, in partial remission, chronic fatigue syndrome, MS (relapsing remitting), obstructive sleep apnea, and vitamin D deficiency. (R. 2052). In terms of psychiatric treatment, she was doing well on Effexor and Abilify. (R. 2052).

January 30, 2018 neurology notes indicate that Plaintiff had endured an episode in which her

legs were weak for one week, and that she had to use a wheelchair during that time; she felt it was minor and did not report it at the time. (R. 2054) She reported ongoing fatigue, but studies showed sleep apnea events were mild. (R. 2054). Her mood had slipped due to losing her job. (R. 2054). Gait was narrow based and stable. (R. 2055). Mental status was normal. (R. 2055). Motor exam was normal. (R. 2055). Examination in March 2018 was essentially the same: normal with a stable gait. (R. 2057-58). In May, she reported face numbness and fatigue after doing a lot of walking on vacation at Universal Studios. (R. 2061). Right arm and leg strength were reduced at 4/5. She was using a cane to walk (R. 2062).

On June 9, 2018, an MRI revealed minimal disc bulge at C5-6 and mild degenerative change at L5-S1. (R. 2070-71). There were no new lesions found. (R. 2063). In August 2018 neurology notes reflect reports of weakness and hip pain. (R. 2064). She had her first infusion therapy and tolerated it well with some fatigue afterward. (R. 2064). Right arm strength was reduced to 4/5; gait was stable. (R. 2065). A month later plaintiff returned with complaints of facial drooping and numbness and tingling in her hands. (R. 2067). Physical examination findings reveal a pronator drift on the right side, as well as reduced fine touch in the right arm compared to the left. (R. 2067-2068). She could walk without assistance. (R. 2068).

At plaintiff's hearing, Dr. Steven Goldstein, a neurologist, testified by telephone as a medical expert (ME). (R. 54). Dr. Goldstein confirmed diagnoses of MS, sleep apnea, and morbid obesity, with a BMI of 39. (R. 54-55). In the doctor's opinion, plaintiff's condition neither met nor equaled listing level severity, and she could function at a sedentary level. (R. 55). But he allowed there had been periods of time during which plaintiff's exertional capacity was less than sedentary, although he believed these never lasted for 12 months. (R. 55). There were also times when plaintiff had

difficulty with handling, fingering, and reaching – especially with the right hand and arm -- and might be limited at those times to only occasional use of her right upper extremity. (R. 55). But, again, Dr. Goldstein felt there was no 12-month period during which such a limitation would apply. (R. 55). The doctor couldn't tell from the record whether plaintiff would have down time following infusion therapy. (R. 56).

Plaintiff's treating therapist, Chloe Brodner, completed a form from plaintiff's attorney on August 24, 2017. (R. 2043-2045). Ms. Brodner reported a diagnosis of major depressive disorder, recurrent and severe, and noted that plaintiff exhibited symptoms of social anxiety as well. (R. 2043). Ms. Brodner wrote that plaintiff suffered fatigue, loss of focus, depressed mood and low energy triggered by social interactions. (R. 2043). She felt that plaintiff's mental illness markedly restricted her daily activities and socialization, and markedly limited her ability to sustain concentration and attention, resulting in a frequent failure to complete tasks. (R. 2043-44). Ms. Brodner noted that plaintiff often walked with a cane. (R.2044). She felt that, due to depression, social anxiety, and MS, plaintiff would be unable to sustain work tasks. (R.2044).

On October 4, 2018, Dr. Sarada Abraham, M.D., plaintiff's treating, primary care physician since May 2017, completed a physical residual function capacity form from plaintiff's attorney. (R. 2074-2077). Dr. Abraham reported diagnoses of MS, depression with suicidal ideation, PTSD, obstructive sleep apnea, and optic neuritis. (R. 2074). She indicated that plaintiff's symptoms and limitations would likely become more severe over time. (R. 2074). She stated that during an MS flare, plaintiff's ambulation was completely impaired, and she noted that multiple brain lesions resulted in balance difficulties as well. (R. 2074). Dr. Abraham felt that plaintiff's pain would frequently be severe enough to interfere with the attention and concentration required for simple

8

work tasks, and stress would constantly interfere with those functions. (R. 2075). Plaintiff would require unscheduled breaks for about 15 minutes at least twice during the workday, and she would require a cane or other assistive device for even occasional standing and walking. Plaintiff could sit for only 2 hours or stand for 30 minutes before she had to lie down. She could only sit for a total of 3 hours in a workday, and stand/walk for a total of one hour. (R. 2075-76). Dr. Abraham estimated that plaintiff would likely be off-task more than 30 per cent of a workday, absent more than four days per month, unable to complete a workday at least five days per month, and about 50 per cent as effective as an average worker would. (R. 2077). Dr. Abraham felt that plaintiff's combined impairments would make working on a full time basis unrealistic. (R. 2077).

On December 11, 2018, Dr. Gene Combs, Plaintiff's treating psychiatrist, completed a Mental Residual Functional Capacity form from plaintiff's attorney. (R. 2078-2081). Dr. Combs reported diagnoses of PTSD, chronic and complex, and MS. (R. 2078). Dr. Combs estimated that, for more than 15 per cent of a given workday, plaintiff would be unable to understand, remember, and carryout detailed instructions, maintain extended attention and concentration, perform activities within a schedule, sustain an ordinary routine without special supervision, work in proximity to others without distraction, interact appropriately with others, or respond appropriately to changes in the work setting. (R. 2079-80). He said she had similarly serious limitations in her ability to maintain proper attendance and punctuality, or complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace, without an unreasonable number and length of rest periods. (R. 2080). He assessed her with at least average intelligence, but noted that her difficulties are with concentration and handling stress. (R. 2081). Dr. Combs estimated that plaintiff would likely be off-task more than 30 per cent of the time, absent more than six days

9

per month, and about 20 per cent as efficient as an average worker would. (R. 2080).

**B.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a medical expert and a vocational expert, the ALJ determined the plaintiff had the following severe impairments: multiple sclerosis (MS), morbid obesity, sleep apnea, post-traumatic stress (PTSD), depression, and anxiety. (R. 16). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered Listing 11.09B for multiple sclerosis and, citing the opinion of the medical expert, plaintiff's ability to walk a mile, normal clinical evaluations, and no more than a moderate impairment in understanding, remembering and applying information and only mild impairments in other areas, determined the plaintiff did not meet that listing. (R. 17-19).

The ALJ then determined that plaintiff could perform sedentary work except:

> no exposure to dangerous moving machinery or unprotected heights; understand, remember, and carry out simple job instructions; can tolerate frequent interaction with supervisors, coworkers, and the general public; should not have a fast-paced job that requires meeting numerically strict hourly quotas, but can fulfill end of day employer expectations.

(R. 20). The ALJ summarized the medical evidence, noting that there were multiple physician reports that she could walk without a cane, and there was no evidence of any need for an ambulatory device. (R. 20). The ALJ commented that while MRIs showed brain lesions, they were minor and had progressed only slightly. (R. 20). He added that her obesity could be accommodated by the limitation to sedentary work, and that there was no evidence of any reduced ability to use her upper extremities. (R. 21). The ALJ concluded that the plaintiff's "medically determinable impairments

could reasonably be expected to cause the alleged symptoms; but that her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 20). Still, the ALJ said plaintiff's allegations were partially consistent with the medical evidence (R. 20) and explained that "[l]imitations from [plaintiff's] MS are based on her admissions of activities she remains capable of performing." (R. 23).

As for medical opinions, the ALJ gave "supreme weight" to the opinion of the medical expert that plaintiff could do sedentary work. (R. 21). The ALJ rejected the opinion of plaintiff's treating physician, critiquing the doctor for basing her finding of disability on the fact that plaintiff's MS would likely get worse. (R. 21). The ALJ went on to note plaintiff's treating doctor was not a specialist, and her treatment notes were signed by others. (R. 21). There was no indication of how often the doctor saw plaintiff, and her opinion was not consistent with the medical record. (R. 21). The ALJ also rejected the opinion of plaintiff's treating psychiatrist because he had seen her only 3 times in 6 months and failed to support his opinion with treatment records. (R. 22). The ALJ also rejected the psychiatrist's and therapist's use of GAF ratings, as they were not supported by the medical evidence. (R. 22).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could not perform her past relevant work because it was performed at a medium level. (R. 23). The ALJ found, further, given plaintiff's residual functional capacity, she could perform the following work: inspector (DOT 669.687-014; 20,000 jobs in the national economy); surveillance system monitor (DOT 379.367-010; 40,000 jobs); or bonder (DOT 726.685-066; 5,000 jobs). (R. 24). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 24-25).

II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017)

The substantial evidence standard is a low hurdle to negotiate. *Biestek*, 139 S. Ct. at 1154. But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Fair v. Saul*, _Fed.Appx._, 2021 WL 1711810, at *4 (7th Cir. Apr. 30, 2021); *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*,

78 F.3d 305, 307 (7th Cir. 1996)("... we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). The subjectivity of the requirement – one reader's Mackinac Bridge is another's rickety rope and rotting wood nightmare – makes it difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged. But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).

### III.

The plaintiff has three issues with the ALJ's decision denying her benefits. First, the plaintiff argues that the ALJ erred when he failed to find plaintiff's MS met or equaled Listing 11.09. Second, she complains that the ALJ's RFC finding fails to accommodate all the limitations she suffers due to her combined impairments. And, finally, the plaintiff contends the ALJ improperly rejected the opinions of her doctors and therapist.

### A.

To support his finding that plaintiff's condition neither met nor equaled a listed impairment, the ALJ cited the expert testimony of Dr. Goldstein, cited a lack of evidence of a marked limitation in physical functioning, and a lack of evidence of a marked limitation in mental functioning. (R. 17-19). Dr. Goldstein's opinion, however, was pretty much the bottom line and no more:

ALJ: Were these conditions of listing level severity?

ME: Not in my opinion, your honor.

(R. 55). And that was it. Generally speaking, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Turubchuk v. S. Illinois Asphalt Co., Inc.*, 958 F.3d 541, 554–55 (7th Cir. 2020). But there were no obstacles to cross-examination here. *Cf. Biestek v. Berryhill*, – U.S. –,–, 139 S. Ct. 1148, 1156 (2019)(". . . an ALJ and reviewing court may properly consider obstacles to such questioning when deciding how much to credit an expert's opinion."). Counsel was allowed to question the expert, but went down another path and didn't challenge his listing opinion. (R. 55-56). So the opinion remained, unchallenged until plaintiff filed her brief, which is a little too late for practical purposes.

In order to navigate the often byzantine Listings of Impairments and determine whether a plaintiff's condition meets one of them, the ALJ was not only entitled to rely on an opinion like Dr. Goldstein's, *see Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004)(opinion of a medical expert as to meeting or equaling a listing is substantial evidence), but if he had not, there likely would have been trouble. *See Gebauer v. Saul*, 801 F. App'x 404, 408–09 (7th Cir. 2020)("The use of a medical expert can help ALJs resist the temptation to "play doctor," a label that usually produces a remand on judicial review, by evaluating medical evidence on his or her own."). It's all the more advisable to do so when the impairment is one which ebbs and flows, like multiple sclerosis. *Gebauer*, 801 F. App'x at 409.

And the listing for multiple sclerosis, it must be said, doesn't do anyone any favors. The one at issue here is 11.09B, which requires:

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in

> one of the following:
>
> 1. Understanding, remembering, or applying information (see 11.00G3b(I)); or
>
> 2. Interacting with others (see 11.00G3b(ii)); or
>
> 3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
>
> 4. Adapting or managing oneself (see 11.00G3b(iv)).

As is often the case, it is filled with references to other sections which in turn refer to still others. Most importantly, for our purposes here, is the reference to the definition of a "marked limitation." It is not particularly edifying:

> You may have a marked limitation in your physical functioning when your neurological disease process causes persistent or *intermittent* symptoms that affect your abilities to independently initiate, sustain, and complete work-related activities, such as standing, balancing, walking, using both upper extremities for fine and gross movements, or results in limitations in using one upper and one lower extremity. The persistent and *intermittent* symptoms must result in a serious limitation in your ability to do a task or activity on a sustained basis. We do not define "marked" by a specific number of different physical activities or tasks that demonstrate your ability, but by the overall effects of your neurological symptoms on your ability to perform such physical activities on a *consistent and sustained* basis. You need not be totally precluded from performing a function or activity to have a marked limitation, as long as the degree of limitation seriously limits your ability to independently initiate, sustain, and complete work-related physical activities.

11.02G(emphasis added).

As the plaintiff points out, intermittent symptoms may still result in a marked limitation. *Oxford Languages* defines intermittent as "occurring at irregular intervals; not continuous or steady"; like being unable to do much of anything during a flare that requires hospitalization here and there. But the listing also says the overall effects must be "consistent and sustained." Consistent is defined as "unchanging in nature, standard, or effect over time" and sustained is defined as "continuing for an extended period or without interruption" – pretty much the antonym of intermittent. Do four or

15

five hospitalizations for MS flares over the course of an entire medical record qualify as "consistent and sustained"? One supposes that Dr. Goldstein didn't think so. Neither the plaintiff nor the Commissioner's lawyer attempt to make sense of the horrible definition of "marked", however, and we can't blame them. It puts one in mind of the years of litigation over the definition of "pattern of racketeering activity" in the RICO statute. *See, e.g., Papai v. Cremosnik*, 635 F. Supp. 1402 (N.D. Ill. 1986); *A.I. Credit Corp. v. Hartford Computer Grp., Inc*., 847 F. Supp. 588 (N.D. Ill. 1994).

But the question remains, are the "intermittent" times that plaintiff's MS flared seriously enough to require hospitalization "consistent and sustained"? The ALJ mentioned only one hospitalization, the one in May 2017 (R. 18) – although there were actually two that month and a few others earlier on – so we can't be sure he considered whether those all added up to "intermittent" and "consistent and sustained." But, the manner in which the medical expert – whom the ALJ relied upon – testified, however briefly, gives one pause. The doctor gave the impression that because plaintiff's MS wasn't giving her marked symptoms continuously for twelve months, just from time to time, she wasn't disabled. That, of course, ignores the allowance marked limitations might be "intermittent."

The ALJ determined that plaintiff's MS was severe. That means it meets the twelve-month duration requirement. 20 C.F.R. § 404.1520(ii)("If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled."). Accordingly, when he and the medical expert got to step 3 and had to determine whether plaintiff's MS met the listing, the twelve-month period ought to have been off the table. The impairment has lasted for twelve months, 20 C.F.R. § 404.1525(c)(4); and at that point in the

16

analysis, it's the severity of it that matters – whether it results in those "intermittent" and "consistent and sustained" limitations – and *that* doesn't have to be continuous for twelve months. Because the medical expert talked about limitations that didn't last twelve continuous months, we can't be sure that he – or, by accepting that stance, the ALJ – looked at this the right way.

**B.**

But, no matter. Even if plaintiff's MS does not meet the listing, plaintiff is correct that the way the ALJ – and, again, Dr. Goldstein – looked at her MS in terms of capacity for work was flawed. Residual functional capacity means the level of work a claimant can "perform 8 hour a day, 5 day a week . . . 'regular employment' on a 'regular and continuing basis.'" *Jeske v. Saul*, 955 F.3d 583, 593 (7th Cir. 2020); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)(RFC is" the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from her impairments."). Plaintiff's MS flares were sufficiently debilitating that she was hospitalized for a total of about a month from August 2016 to the end of May 2017. She required treatment for three days, August 12-14, 2016; four days, March 25-28, 2017; five days, March 31-April 4, 2017; ten days, April 22-May 2, 2017; and three days, May 26-28, 2017. From March through May 2017, she was in the hospital about a quarter of the time. These were not occasions where plaintiff showed up at an emergency room, was briefly treated, and sent on her way. Her condition was bad enough that doctors kept her there for multiple nights.

In between those hospitalizations, there were, as the ALJ found, a number of normal and near normal examinations, as well as some not so normal. But this is not a weighing evidence problem. One cannot just ignore the many times plaintiff was incapacitated, even for just a few days here and there, and say overall, she is capable of sedentary work. Dr. Goldstein conceded that there were

17

periods of time during which plaintiff was unable to perform even sedentary work. (R. 55). And he added that there were also periods of time where she wouldn't be able to use her dominant arm and hand any more than occasionally. (R. 55). But he felt that was fine because none of those periods lasted 12 months. (R. 55).

The ALJ accepted that take, and essentially ignored the repeated hospitalizations and flares – with the exception of May 2017 – focusing on when the plaintiff walked around Universal Studios, and times when she did not need a cane. (R. 18, 20). But if the ALJ is going to ignore 20 days of hospitalizations, one has to say that's a skewed view of the record. And, perhaps more importantly, it's the wrong way to view the record.

"A person who has a chronic disease . . . is likely to have better days and worse days; that is true of the plaintiff in this case." *Bauer v. Astrue*, 532 F.3d at 606, 609 (7th Cir. 2008). If the flares come and go to the extent that plaintiff has to be hospitalized a quarter of the time in a three-month period, or over and over during a ten- or twelve-month period, how can she hold down a full-time job? *Bauer*, 532 F.3d at 606.[2] The answer is clear: she can't.

Much as the ALJ did in *Lambert v. Berryhill*, 896 F.3d 768, 776–77 (7th Cir. 2018), both the ALJ and the medical expert here operated as though the plaintiff:

> needed to prove that [s]he was unable to work for an identifiable, continuous 12-month period. This argument misreads the statute. The Act does not specify how long a claimant must be unable to engage in substantial gainful activity. Instead it is the claimant's "medically determinable physical or mental impairment" that must have "lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

---

[2]"Vocational experts, who testify at all Social Security disability hearings, invariably testify that missing work more than three days a month precludes full-time gainful employment, and the administrative law judges seem always to credit that testimony." *Mitze v. Colvin*, 782 F.3d 879, 881 (7th Cir. 2015); *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir.2013); *Pepper v. Colvin*, 712 F.3d 351, 361 (7th Cir.2013).

*Lambert*, 896 F.3d at 776–77.  As the court explained in *Lambert*, that reading is incorrect.  There's no dispute that the plaintiff's MS is severe and has lasted for a continuous period of twelve months – and will continue to last thereafter.  The question should have been whether, despite that qualifying impairment, plaintiff could nevertheless "perform 8 hour a day, 5 day a week . . . 'regular employment' on a 'regular and continuing basis.'" *Jeske*, 955 F.3d at 583; *Moore*, 743 F.3d at 1121.  The ALJ's reading of the law – and Dr. Goldstein's – "would preclude benefits for anyone with an impairment that causes 12 months of bad days with good days interspersed." *Lambert*, 896 F.3d at 777; *see also Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir.1990) (improper in case involving multiple sclerosis to focus on intervals of normal activity during periods of remission).  Plaintiff did not have to prove her MS kept her from working for twelve continuous months; but that is the standard the ALJ and the medical expert held her to.  And so, even setting the listing issues aside, this case has to be remanded.  A more thorough opinion from a medical expert on the listing issue given the "intermittent" and "continuing and sustained" problem would be advisable.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #15] is denied and this case is remanded to the Commissioner for further proceedings consistent with this Opinion.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 6/29/21